## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

JANET CHANG,
   Plaintiff

                   :

Vs.                          :        C.A. NO.

TRINITY COLLEGE         :
   Defendant                :        SEPTEMBER 22, 2014

## COMPLAINT

## INTRODUCTION

1. This is an action for monetary damages, costs, attorney's fees, and other relief as a result of Defendant's discriminatory conduct undertaken against Plaintiff on the basis of her race and ethnicity in violation of federal and state law.

2. Plaintiff brings this action under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et. seq.* ("Title VII"), the Connecticut Fair Employment Practices Act, Conn. Gen. Stat. § 46a-60 *et. seq.* ("CFEPA"), and the common law of the State of Connecticut.

## JURISDICTION

3. This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1331 because it presents a federal question under 42 U.S.C. § 2000e *et.seq.*

4. This Court has supplemental jurisdiction over state law claims pursuant to 28 U.S.C. §1367.

5. Plaintiff dual filed her claims with the Connecticut Commission on Human Rights and Opportunities ("CCHRO") and Equal Employment Opportunity Commission ("EEOC") on November 20, 2013.

6. Plaintiff received a release of jurisdiction from the CHRO on or about June 30, 2014 and the EEOC on or about July 14, 2014.

## PARTIES

7. Plaintiff, Janet Chang, presently residing in West Hartford, Connecticut, is a Chinese refugee who emigrated from Laos to the United States.

8. Defendant, Trinity College, is a private, nonstock corporation, governed by a Board of Trustees pursuant to the terms of its original charter. Founded in 1823, Trinity College holds itself open to the public as a liberal arts college and educational institute committed to diversity located at 300 Summit Street, Hartford, Connecticut. Defendant Trinity College is an employer within the meaning of, and subject to the provisions of, Title VII and CFEPA.

## BACKGROUND

9. Plaintiff, who was a first generation high school and college graduate, obtained her Ph.D. in social psychology from the University of California, Davis, in 2006.

10. Plaintiff was hired by Defendant following a national search wherein Defendant's Psychology Department advertised for a person to fill a position in "social psychology with cultural psychology emphasis" on tenure track. During the interview for the position, Plaintiff described her research focus in cultural and ethnic minority psychology studying diverse (e.g., Asian-American)

populations, an emerging, non-traditional field, and explained the methodology used in performing her research, also non-traditional, involving the use of quantitative/secondary data analysis based on large scale datasets and non-experimental research.

11. At all times relevant to Plaintiff's complaint none of the tenured members of the Psychology Department conducted research in Plaintiff's area of expertise that encompasses cultural, clinical, community, social, and personality psychology, nor did any of the tenured members of the department publish in that area of expertise using quantitative (e.g., secondary data analysis, survey methods) and qualitative (e.g., focus groups) research methods to ascertain how psychological and cultural factors are responsible for ethnic/racial differences. To that extent that the tenured members of the Psychology Department publish, or have continued to publish, the Department's tenured members use the traditional, universalism approach, which prioritizes a single, overarching theory that aims to explain all people in general and uses experimentalism that employs a single experiment frequently repeated, modified or built upon to prove a hypothesis.

12. Defendant never stipulated the substance of Plaintiff's research program beyond what was stated in the position description as a condition of hire or performance. At no time prior to the tenure decision, including in the interview session before hire, did the tenured members of Psychology Department advise Plaintiff that conducting research in the traditional format favored by the

tenured members of the Psychology Department was a required component of the research and scholarship criteria applicable to the tenure decision.

13. Plaintiff accepted the position of Assistant Professor in the Psychology Department with the understanding that she would continue research and publication involving ethnic minority and cultural psychology using methodologies appropriate for her field, including secondary data analyses, mixed (quantitative and qualitative) methods, and the external recruitment of diverse participants (outside of Hartford), and reasonably expected that the review of her performance in this area of expertise would be judged using criteria appropriate to her field.  Plaintiff reasonably expected that the Defendant would assure that the tenured members of the Psychology Department would not arbitrarily impose a standard for conducting and publishing research that was not required or acceptable in Plaintiff field of research.

14. According to Appendix B attached to the Trinity College Faculty Manual, Defendant has committed itself to "Non-Discrimination" and "Affirmative Action at Trinity College."  Under the Affirmative Action policy, Defendant states it is "committed to being an academic community free of discrimination and prejudice" and to that end will abide by federal and state law pertaining to non-discrimination and fair employment practices, including no discrimination against any individual on the basis of race, color and national origin, among other categories.

4

15. Defendant's Affirmative Action policy states, "The College is committed to building a representative and diverse Faculty, staff, and administration and student body and will undertake positive efforts to ensure that this end is achieved."

16. Defendant's Affirmative Action policy also recognizes the need to eliminate existing discriminatory conditions, whether purposeful or inadvertent, and to systematically examine all of its appointment and employment practices to be sure they do not operate to the detriment of any person on the grounds of race, color, and national origin.  All members of the Trinity community are obligated to implement this policy in order to assure that criteria for appointment and employment do not in effect or intent exhibit discrimination.

17. Defendant's Affirmative Action policy claims a conviction that the quality of education is enhanced by the appointment of Faculty who represent diverse disciplines, as well as various racial, ethnic and cultural backgrounds. Therefore, in addition to the principle of non-discrimination, Trinity College represents that the principle of affirmative action requires additional effort to recruit, employ and promote qualified members of groups formerly excluded and presently under-utilized.

18. Defendant's Affirmative Action policy states "the principle of Affirmative Action shall be given weight in the review process by departments ... the Appointments & Promotions Committee (including the Dean), the President, and the Appointments and Promotions Appeals Board (if relevant) in two ways:

5

(1) dimensions and assessments peculiar to a minority or female candidate,

such as service on search committees, student advising, student recruitment

activities, and appropriate public relations activities must not be neglected; (2)

the candidates scholarly activities, particularly when these are in new or non-

traditional fields, must receive a fair and unbiased review."

19. During her employment with Trinity College, Plaintiff was one of two Asian

American female tenure-track professors employed on Defendant's faculty.

There were no tenured Asian American female professors employed at Trinity

College when Plaintiff was hired and there are none employed by Trinity

College at the time of the filing of this complaint.  In addition, Plaintiff was the

only minority faculty member in an all White Psychology Department.

20. Plaintiff began working for Defendant in 2006 as an Assistant Professor of

Psychology on tenure track.

21. The terms of Plaintiff's employment on tenure track were expressed and

implied.  The terms of employment appeared in written documents such as the

letter of appointment, the Trinity College Faculty Manual ("Faculty Manual" or

"F.M."); official statements from administrators, such as the Dean of Faculty,

and from the Appointment & Promotions Committee, annual evaluations, if

provided, and reappointment letters referring to the criteria applicable to the

tenure decision along with Plaintiff's progress toward the tenure decision.  The

terms and performance and performance of the employment agreement also

derive from verbal and written communications from the tenured members of

6

the college and the Psychology Department, the circumstances of Plaintiff's employment and academic policies, customs and usage at Trinity College, as demonstrated in past tenure decisions, and generally accepted practice and policies recognized by academic institutions, such as the American Association of University Professors' 1940 Statement of Principles on Academic Freedom and Tenure, adopted by Trinity College according to the Faculty Manual at Chapter 23, which counsels that the terms and conditions of employment on tenure track should be in writing and communicated to the faculty member at the commencement of employment.

22. As indicated in the Faculty Manual, the Appointment and Promotions Committee ("A & P Committee"), the Dean of the Faculty, the President, the Academic Affairs Committee of the Board of Trustees, and the Board of Trustees or its Executive Committee "share responsibility" for appointment, reappointment, and tenure decision.  A separate Appointment and Promotions Appeals Board is allowed to consider procedural and fairness appeals when a negative decision is made by the A & P Committee or by the President.

23. Under the terms of Trinity College's Faculty Manual, employment on tenure track envisions a "probationary period" with an initial three year appointment leading to a reappointment decision in the spring of the third year followed by an additional three year appointment with a tenure decision made in the spring of the sixth year.  F.M. Chapter 11, § 2.1.a.i, § 2.2.b.i, and § 2.2.b.ii.

7

24. During Plaintiff's employment the Faculty Manual was amended in February 2008 to change the process of reappointment from one where there were two reappointment decisions, after the second and fifth year, to a reappointment process where there was one reappointment decision that occurred in the third year.  Thus, Plaintiff was reviewed and reappointed by the A & P Committee on two occasions, on April 24, 2008, her second year, and on March 29, 2010, her fifth year.

25. The probationary period may be extended for medical reasons.  F.M. Chapter 11, § 2.2.b.v.

26. Tenure is an employment relationship offered in the academic employment setting, described as a "long term commitment" by Defendant in its Faculty Manual, which obligates the college or university to offer a professor employment during each academic year following the granting of tenure, unless there is adequate cause to terminate employment.

27. Defendant's Faculty Manual promises, as a matter of policy, that the A & P Committee, made up of five, tenured members of the faculty from across the disciplines, "exercises the greatest care" in making the tenure decision which will only be recommended by that committee if it is "persuaded by the prospect of continuing and significant contributions from the candidate."  F.M. Chapter 11, § 2.2

8

28. An additional policy of the Defendant applicable to tenure decisions is that "the criteria used to evaluate a candidate … are neither so narrowly construed, nor applied in such a way, as to prejudice the case against an individual on the basis of race, gender, religion, or for unconventional points of view or lifestyle, or for conducting research in non-traditional areas." F.M. Chapter 11, § 2.2

29. Appointment, reappointment and tenure decisions are supposed to be made in accordance with specified criteria and procedures in the Faculty Manual whereby evidence related to general criteria involving teaching, scholarship and service is gathered by the candidate and her department into the candidate's file by the departmental review committee, whose chair is denominated the "filekeeper." The filekeeper serves as an impartial facilitator and materials collector for the candidate's file, and in that capacity is neither an advocate nor a detractor for the candidate seeking a decision from the A & P Committee. Once the materials are collected by the filekeeper, the decision is evaluated in sequence by the department whose recommendation is then passed on to the A & P Committee and various other decision-makers. F.M. Chapter 11, § 2.2.d, § 2.2.d.i.a, including note 7.

30. A tenure candidate's file typically includes the departmental recommendation prepared by the filekeeper, the candidate's C.V., prior letters of appointment and reappointment, the candidate's statement, internal and external letters addressing teaching, research and scholarship, student course evaluations

9

and course materials, and publications and manuscripts submitted for
publication.  F.M. Chapter 11, § 2.2.d.i.d.i

31. Although the Faculty Manual is silent on this matter, custom and usage at
Defendant allows candidates to update the status of publications submitted to
the filekeeper during the process, a right that was denied to Plaintiff by her
filekeeper in this case.  To Plaintiff's prejudice, the A & P Committee was not
informed that another of three journal articles submitted for publication had
been accepted by the top journal in Plaintiff's field in May 2013 during their
deliberations in her case.

32. All decision-makers are required to apply the same standard to the expressed
criteria which should be clearly expressed to both the candidate and those
who are required to judge performance against the standard applicable to the
stated criteria as the same have been defined by the tenured members of the
Psychology Department.

33. According to the procedures applicable to the department recommendation, as
mandated by the Defendant's policy, "the principle of Affirmative Action shall
be given weight in the review process by departments ... the Appointments &
Promotions Committee (including the Dean), the President, and the
Appointments and Promotions Appeals Board (if relevant) in two ways: (1)
dimensions and assessments peculiar to a minority or female candidate, such
as service on search committees, student advising, student recruitment
activities, and appropriate public relations activities must not be neglected; (2)

10

the candidates scholarly activities, particularly when these are in new or non-traditional fields, must receive a fair and unbiased review."

34. At each stage of the process of reappointment, promotion and tenure, the department as well as the A & P Committee, Dean of Faculty and President are expected to review the candidate's record with expectation appropriate to the rank.  At the reappointment review, particular attention is required to be given to a candidate's prospects for tenure, and the A & P Committee is required to "indicate as clearly as possible those areas to which a candidate needs to address special attention before the tenure decision."  Chapter 11, F.M. § 2.2.c

35. The criteria for reappointment describe teaching, scholarship and service in subjective terms applicable the area.  In the case of scholarship, the criteria for reappointment is stated as "Scholarship should now be coming to fruition; the candidate should be involved in continuing focused scholarly activities in his or her field."  F.M. Chapter 11, § 2.2.c.i.

36. At the time of promotion to Associate Professor with tenure, the scholarship criteria is stated as "The candidate's research should have progressed beyond the stage of promise and should have achieved its promise of fruition. Significant public demonstration of scholarship and a corresponding professional recognition should now be evident."  F.M. Chapter 11, § 2.2.c.ii

11

37. The term "fruition" is not defined by the Faculty Manual, however, accepted custom and practice at Defendant provides that in disciplines where publication is a component of scholarship, journal articles completed and submitted to external reviewers and for publication are considered to have reached fruition.

38. Following the receipt of the recommendation of the department, the A & P Committee deliberates on the questions of reappointment, promotion and tenure by review of the materials in the file.  The A & P Committee is also empowered to conduct interviews of the candidate, the review committee chair and any other contributor to the file.  F.M. Chapter 11, § 2.2.d.i.d.ii

39. In the event the case is ultimately decided in the negative, the Dean of the Faculty is required to provide the candidate with a letter "citing in detail the reasons for the negative recommendation."  F.M. Chapter 11, § 2.2.d.i.d.iii

40. "For tenure-track Faculty members with a previous letter of reappointment," the discretion applicable to the tenure decision is specifically limited by the Faculty Manual's requirement that "a negative decision must be based on a failure to meet standards of improvement derived from expectations for rank and specified in the last letter of reappointment."  F.M. Chapter 11, § 2.2.d.i.d.iii

41. Following the deliberations and decision by the A & P Committee, the Dean of Faculty and the President each review the candidate's materials and prepare

12

letters containing their recommendations to be shared with the other decision-makers.  In the event there is unanimity the decision either advances to the Academic Affairs Committee of the Board of Trustees for ratification in a positive case or ends at this stage subject to appeal to the Appointments & Promotions Appeals Board.  In the event there is a split in the decision-making at the A & P Committee/Dean/President level, additional consultation among the decision-makers is mandated, and if the split decision remains, then the case advances to the Academic Affairs Committee of the Board for deliberation and final decision based on the criteria in the Faculty Manual, the last letter of reappointment and the evidence in the file.  F.M. Chapter 11, § 2.2.d.i.d.iii.b and § 2.2.d.i.d.iii.c

42. In order to foster clear communication of expectations regarding the tenure procedures and standards, the departments and the A & P Committee communicate information to the tenure track candidate through annual and reappointment reviews and through departmental mentoring as provided for in the Faculty Manual and in directions from the A & P Committee and the Dean of Faculty.

43. Thus, the duties of the Department Chairs include, "Guidance and evaluation of Faculty," which is described as a major responsibility of the chair, carried out in discussions with the untenured faculty member and the Dean of Faculty on an annual basis.  "They serve as advisors to the new Faculty regarding College policies on promotion and tenure …"  F.M. Chapter 21, § 2.2

44. Consistent with the mandate to Chair to serve as advisors, the Dean of the Faculty communicated a directive to all Chairs on November 2, 2006, shortly after Plaintiff commenced employment, instructing chairs to "act as advisors and mentors every year" as this was "an extremely important role" that chairs of departments played at Defendant. Unfortunately for Plaintiff, the Chairs of the Psychology Department did not fulfill his/her duty to act as a mentor toward Plaintiff and that failure contributed to a flawed tenure decision-making process as a material breach of Defendant's obligation to communicate information applicable to the tenure decision.

45. Shortly following Plaintiff's employment at Trinity College, on October 17, 2007, the A & P Committee and the Dean of Faculty reiterated the need for written guidelines from departments that were due to be completed by October 31, 2003. The memoranda pointed out that in April of 2003, all departments were asked to "discuss and articulate (1) what constitutes scholarship and teaching in [its] discipline and (2) how [it would] operationalize the appointment and promotion criteria as stated in the Faculty Manual" for reappointment, promotion and tenure decisions. The October 17, 2007 memorandum further noted that the written guidelines "would be enormously beneficial not only to candidates as they go about preparing for professional advancement but also to departments/programs in articulating ways in which its expectations are achieved. The A & P Committee relies heavily on the assessment of the departments/programs in making its decisions. Because candidates rely on being clear about both the categories and how the departments/programs put

14

into operation the criteria, the A & P Committee is seeking way to help

departments and programs be explicit about these matters."

46. Plaintiff requested the mandated written guidelines from the Psychology

Department's filekeeper, William Mace, however the filekeeper never provided

the mandated written guidelines to Plaintiff as requested.  When Plaintiff asked

whether the Psychology Department would require publications based on work

with students at Trinity and consider research based on secondary data

analysis insufficient for tenure based on comments made by the Department

Chair Anselmi, Professor Mace stated, on or about October6, 2009, "Mainly

you have to have recognized scholarship, as testified to by the experts in your

field – in this case the external evaluators who are reading your work.  I don't

think we would go so far as to say that publications based on student work are

absolutely required.  They are good, of course.  At tenure time, you need to

show what your scholarship looks like as a Trinity faculty member.  And you

need to show what impact you have on students.  Publications with students

are good ways to show both of theses at once."  Otherwise, the Psychology

Department failed to clearly articulate the department's standard related to

acceptable methods of research.

47. Following Plaintiff's successful appeal to the Appointments and Promotions

Appeals Board it was determined the Psychology Department never produced

the mandated written guidelines applicable to the department's standard for

scholarship.  The failure of the Psychology Department to provide Plaintiff with

15

a statement of the scholarship criteria applicable to tenure also contributed to a flawed tenure decision-making process as a material breach of Defendant's obligation to communicate information applicable to the tenure decision.

48. During the reappointment process the A & P Committee directed the Psychology Department to take specified steps to mentor and advise Plaintiff regarding application of the tenure criteria following each review.  Plaintiff did not receive the advice and mentoring as directed and this failure to provide advice and mentoring as directed also contributed to a flawed tenure decision-making process as a material breach of Defendant's obligation to communicate information applicable to the tenure decision.

49. Professor Mace falsely informed the A & P Committee in an undated letter following the second reappointment and in another letter dated November 17, 2010 that Plaintiff had been provided with information critical to her scholarship criteria, as well as the opportunity to address concerns related to her scholarship.

50. Plaintiff was reappointed in 2008 following review by the tenured members of the Psychology Department and A & P Committee.

51. Plaintiff was again reappointed following review by the tenured members of the Psychology Department and the A & P Committee on March 29, 2010. Following the department's analysis and recommendation, the A & P Committee noted that Plaintiff had published four articles in peer-reviewed

16

journals before joining Trinity and one since 2006, with two articles under editorial review.  The committee also noted Plaintiff had been awarded "a prestigious Robert Wood Johnson Foundation grant to fund research from 2009 to 2011.  The A & P Committed then concurred with the Psychology Department's "sentiment" that "by the time of the tenure decision, Professor Chang should be able to provide clear evidence that she is an independent and productive scholar with a clearly defined research program.  Specifically, Professor Chang should produce several quality publications based on both secondary data analysis *and* empirical work conducted on this campus, and clearly articulate her research program and plan for direction of her future research."

52. Because Plaintiff believed there was a misinformed notion or miscommunication of the standard applicable to the tenure decision, Plaintiff requested mentoring, advice and permission from Psychology Department Chair Dina Anselmi, who was also acting as filekeeper at the time, to file a response to the A & P Committee's March 29, 2010 letter.  Chair Anselmi, who had made clear her bias against Plaintiff by announcing that Asians were not considered minorities under the Trinity College Affirmative Action policy during a search committee meeting at which Plaintiff attended, advised Plaintiff that she could not respond to the letter.  This incorrect advice, in direct contradiction to Defendant's policies and practices as recognized by the A & P Committee's communication to faculty documenting the existence of such a right in June 2010, materially disadvantaged Plaintiff and caused a flawed

tenure decision and material breach of the employment agreement because the Psychology Department's ambiguous and potentially arbitrary standard applicable to Plaintiff's research and publication in the direction to "produce several quality publications based on both secondary data analysis *and* empirical work conducted on this campus" was allowed to remain unchallenged as a condition applicable to the tenure criteria.

53. In 2011, Plaintiff was out of work on a medical leave of absence, which extended the probationary period of her tenure review by one year.  Neither the Chair nor Professor Mace provided assistance and support to Plaintiff with regard to understanding all the options available to her and how to proceed in Plaintiff's best interest with regard to the effect the medical leave had on her tenure decision.   Furthermore, the Psychology Department failed to consider and account for this medical leave of absence and its effect on the pace and timing of publication in its tenure decision review.

54. In the fall of 2012 and the spring of 2013, Plaintiff's tenure case was prepared and reviewed in accordance with the criteria for tenure.  Following the receipt of the second reappointment letter, one of Plaintiff's previously submitted articles was accepted for publication in a flagship journal, *Cultural Diversity and Ethnic Minority Psychology*, and Plaintiff completed three additional journal articles and submitted them for publication in top journals by the time her file was considered by the Psychology Department for tenure in January 2013.  The three articles submitted for publication to top journals were based

18

on the research performed at Trinity College and were all accepted for publication in 2013. Two of the articles used the grant funding received from the prestigious Robert Wood Johnson Foundation and were accepted for publication while Plaintiff's case for tenure was under consideration; one was accepted in February of 2013, the other was conditionally accepted in May 2013. Plaintiff's publications were based on secondary data analysis and empirical work conducted at Trinity. Plaintiff also demonstrated in her candidate statement on research and through the listing of manuscripts in preparation that she had an established research program and plan for the direction of her future research.

55. In January of 2013, the Psychology Department deliberated and the filekeeper then forwarded the Department's recommendation to the A & P Committee. The Psychology Department's recommendation begins with reference to the standard or improvement designated in the second letter of reappointment regarding scholarship, namely "several quality publications" and the need to "clearly articulate her research program." After implicitly recognizing that Plaintiff had submitted several publications as required to evaluate the development and trajectory of Plaintiff's work, the Psychology Department does not discuss the quality of those publications as framed by the reviews of external evaluators and Plaintiff's targeting of top journals for publication, but merely points out that her journal articles based on the Robert Wood Johnson "Fellowship," have not yet been accepted for publication. The Psychology Department's description of this prestigious grant, a grant with a rejection rate

of 94% for applications submitted, represented an intentional effort to minimize Plaintiff's scholarly achievements.

56. The January 2013 Psychology Department recommendation then asserts that Plaintiff's "set of papers is very loosely knit," that there are no findings building one upon another, where one paper provides the motivation for the next, no sustained methodology and no sense of overarching integrative theory. Because of these points, the Psychology Department finds that Plaintiff's work has not progressed beyond the stage of promise to reach the stage of "fruition."

57. The January 2013 Psychology Department recommendation then reviews Plaintiff's scholarship and publication record prior to Trinity College, while Plaintiff was employed at Trinity, and Plaintiff's projected publications and future research. The Psychology Department does not discuss the pace of Plaintiff's production in terms of the type of research and data analysis conducted by Plaintiff, nor does the recommendation acknowledge or discuss Plaintiff's submission to the top rated journals in her field, either because the tenured members of the department are not familiar with the top journals in Plaintiff's field or because the traditional psychological research they engage in is published in different journals.

58. In a display of bad faith, the January 2013 Psychology Department recommendation comments on the lack of publication of Plaintiff's dissertation and an early article that Plaintiff prepared, without informing the A & P

20

Committee that Plaintiff had followed the direction of the department to focus on publishing based on research performed at Trinity College and not publish her dissertation.  The Psychology Department also falsely states that Plaintiff had not had an article published since second reappointment, when in fact a journal article was accepted for publication in *Cultural Diversity and Ethnic Minority Psychology* after the generation of the letter at second reappointment in 2010.

59. In relating the chronology of papers prepared and submitted for publication, the January 2013 Psychology Department recommendation fails to inform the A & P Committee that Plaintiff required a medical leave during her probationary period and how that interruption contributed to the delay in submitting articles to the top tier journals that Plaintiff targeted for publication.

60. The January 2013 Psychology Department's examination of the two journal articles submitted for publication based on the data and analysis funded by the Robert Wood Johnson Foundation grant displays a shocking lack of understanding of the research methods and a properly designed research program in Plaintiff's area of expertise.  This lack of understanding is made plain by raising questions in the recommendation that were answered in Plaintiff's statement of research and journal articles submitted with her tenure application, suggesting the Psychology Department had not read Plaintiff's statement on research or journal articles.

61. In reviewing Plaintiff's future research, the January 2013 Psychology Department recommendation notes articulated goals and seven planned research projects whereby Plaintiff intends to collaborate with others using large sample data sets to further explore ethnic and cultural psychological inquires involving Asian-American and Latino populations.  Then, in a disingenuous conclusion that displays the negative bias of the department toward Plaintiff's non-traditional research, the Psychology Department recommendation contradicts itself by stating the lack of published work deprives the department's tenured faculty members of sufficient concrete data to formulate a positive judgment or to predict her future research productivity and feasibility.

62. In order to judge the quality of Plaintiff's research, Defendant is required to submit Plaintiff's candidate statement, C.V., setting forth the list of completed publications, experts in Plaintiff's field who are asked to comment upon Plaintiff's research and scholarship in connection with the award of tenure. Unlike the tenured members of the Psychology Department, the experts who reviewed Plaintiff's scholarship employ the same research methods in the study of ethnic minority and cultural psychology and publish in their research in flagship journals in the field.  As such, Plaintiff reasonably expected that the tenured members of the Psychology Department would not substitute their judgment regarding appropriate research methodologies and clearly defined research programs.

63. Although the Defendant's procedures do not allow access to external letters of recommendation on the claim of confidentiality, it is evident from the Psychology Department's recommendation that the external experts (whose opinions are not discussed and are barely mentioned by the department) found Plaintiff's work to be excellent. Yet, instead of providing a detailed examination of these expert reports, the Psychology Department's January 2013 recommendation chooses to characterize them in two sentences that are manipulated to support the department's claim that Plaintiff's work has not come to fruition.

64. The January 2013 Psychology Department recommendation fails to discuss the expert opinion of external reviewers and thus unfairly and arbitrarily substitutes the judgment of the tenured faculty members of the department for the expert judgment of those who are more qualified to act as peer reviewers of Plaintiff's work.

65. Overall, the January 2013 Psychology Department's recommendation displays a negative bias toward Plaintiff in its minimization of her accomplishments and its failure to accurately recount Plaintiff's record of achievement regarding scholarship. Worse, Psychology Department's recommendation reveals the application of an arbitrary standard to Plaintiff's research and a failure to contextualize and explain the dimensions of Plaintiff's achievements by applying the actual standard used by those in her field conducting peer-review of Plaintiff's scholarship.

66. Despite the fact that Plaintiff complied with and accomplished the direction related to scholarship contained in the second letter of reappointment to the letter by producing "several quality publications" and "clearly articulating her research program," the Psychology Department shifted the standard applicable to the research, and thereby materially breached the employment agreement, when it interpreted Plaintiff's scholarship through a traditional lens of universalism in determining that Plaintiff's research program did not follow a sustained methodology where one article built on the experimental finding from the previous article, and by determining that Plaintiff's research program was not clearly identified because it did not fit the traditional view of the department's tenured faculty.

67. The January 2013 Psychology Department recommendation also displayed a negative bias against Plaintiff and her research program by its failure to apply and discuss the required application of the Defendant's Affirmative Action policy and Faculty Manual requirement applicable to Plaintiff as an Asian-American female representing less than 1% of the Trinity College faculty conducting non-traditional and emerging research in cultural and ethnic minority psychology.  The failure of the Psychology Department to apply the Faculty Manual's Affirmative Action language in Plaintiff's case, a material breach of the employment agreement, was influenced in no small part by the Chair of the Psychology Department's previously announced opinion that Asian-Americans were not considered minorities to whom the Affirmative Action policy applied.

24

68. Following receipt of the all-White Psychology Department's recommendation, the A & P Committee scheduled an interview with Plaintiff in early May 2013 to consider questions relayed to Plaintiff on April 26, 2013 regarding (1) the department's claim there was no sustained methodology, (2) why the department voted against Plaintiff, (3) who provided mentoring in the department, (4) how the acceptance rates of the journals to which Plainitff submitted three articles compare to journals for the field, and (5) whether the department provided feedback regarding the submitted manuscripts.

69. Because the Psychology Department failed to perform its job in providing context and an accurate description of Plaintiff's work, Plaintiff was pressed to explain the significance of and acceptance of her research methodology and describe how Plaintiff had chosen to submit her research to flagship journals that had high rejection rates in order to demonstrate her expertise as a leading researcher in her field, as already confirmed by the award of the Robert Wood Johnson Foundation grant.

70. Plaintiff was interviewed by the A & P Committee on May 1, 2013. While Plaintiff had been able to inform the A & P Committee that one of two journal articles submitted for publication based on the research funded by the Robert Wood Johnson Foundation grant had been accepted for publication at a top journal, the filekeeper refused to take any action to inform the A & P Committee and other decision-makers that Plaintiff's second article based on that funding had also been accepted for publication at a top journal in May

2013. Nevertheless, following Plaintiff's meeting with the A & P Committee, the A & P Committee voted 3-2 in favor of recommending Plaintiff for tenure. The A & P Committee's split vote followed the racial and ethnic make-up of the committee with the 3 minority members voting in favor of tenure and the 2 White members voting against tenure.

71. Thereafter, the White Interim Dean of the Faculty Richard Prigodich and the White President James Jones considered the case. While their actual recommendations are hidden by Defendant's veil of secrecy, it is evident that a negative recommendation resulted from one or both as Plaintiff's tenure case was then referred to the all-White Academic Affairs Committee of the Board which interviewed Plaintiff on May 17, 2013. During the interview with the committee, the issue of conducting empirical research on campus was a point of emphasis displaying the negative bias set by this condition of improvement in the second reappointment letter if it was intended to require conducting local, unfeasible, time-consuming experiments and data collection on the Trinity College campus reflecting the experimentalism favored by the tenured members of the department.

72. On May 23, 2013, Plaintiff received a letter from Interim Dean of Faculty, Richard Prigodich, dated May 21, 2013, notifying her of Defendant's decision to deny her tenure. The reason stated for the denial of her tenure "was based on the criteria for scholarship for the awarding of tenure as described in the Faculty Manual."

26

73. Plaintiff filed an appeal to the Appointments & Promotions Appeals Board on June 20, 2013 claiming procedural violations, unfairness and discrimination because (1) the Psychology Department failed to provide Plaintiff with critical information used in the decision process, denied her mentoring, and refused to allow her the opportunity to respond the second reappointment letter; (2) the Psychology Department applied a standard of review to her research that was not communicated to her and that differed from what was generally accepted in her field, and (3) the Psychology Department failed to give weight to dimensions appropriate to Plaintiff's non-traditional research, gender and ethnicity.

74. After hearing Plaintiff's appeal the Appointment & Promotion Appeals Board ruled, on July 10, 2013, that a procedural violation occurred because the Psychology Department failed to communicate in writing the standard applicable to scholarship criteria and had failed to specify the reasons for the denial of tenure.  The Appointment & Promotion Appeals Board directed the A & P Committee to revisit the decision, and invited the President and Dean to do likewise in light of this circumstance.  The Appeals Board did not have authority to direct the Academic Affairs Committee of the Board to engage in further review.  On July 23, 2013, the Appointment & Promotions Appeals Board denied Plaintiff's request to allow the A & P Committee the opportunity to review Plaintiff's appeal documents setting forth the reasons why consideration of her case was unfair and discriminatory.  Thus, Defendant denied Plaintiff the opportunity to provide additional information from experts in

her field related to failure of the Psychology Department to provide adequate support and mentoring and explaining the value of research using secondary data analysis in the area of cultural and ethnic psychology and Plaintiff's status as a leader in the field.

75. After revisiting the decision, none of the decision-makers changes their minds and so the denial of a positive recommendation remained unchanged. On August 28, 2013, the Dean of the Faculty wrote to inform Plaintiff the reason for denial of tenure was based on the failure to meet the expectations regarding scholarship as detailed in the second reappointment letter as follows: "The Committee concurs with the sentiments of the Psychology Department that, by the time of the tenure decision, Professor Chang should be able to provide clear evidence that she is an independent and productive scholar with a clearly defined research program. Specifically, Professor Chang should produce several quality publications based on both secondary data analysis *and* empirical work conducted on this campus, and clearly articulate her research program and plan for direction of her future research."

## COUNT ONE:   BREACH OF CONTRACT

1-75   Paragraphs one through seventy-five are incorporated by reference and made paragraphs one through seventy-five of Count One as though more fully set forth herein.

76. In denying tenure to Plaintiff the Defendant breached the employment agreement, including the implied covenant of good faith and fair dealing, in that:

28

a. Contrary to Plaintiff's reasonable expectations, the Psychology Department failed to provide advice and mentoring to Plaintiff regarding the department's standard for scholarship, including the written statement mandated by the A & P Committee in 2003. Plaintiff was led to believe that conducting research and creating journal articles for publication using the non-traditional research methods and programs applicable to her field of expertise would be acceptable to meet the criteria for scholarship in the department only to learn in the tenure recommendation that her non-traditional research methodology and research program based on that methodology were not acceptable and/or not understood by the department when it applied a conservative, traditional model to analyze her work. Thus, the Department failed to provide critical information to Plaintiff to guide her scholarship and/or applied a shifting standard at the time of tenure contrary to what Plaintiff had been previously told.

b. Contrary to Plaintiff's reasonable expectations, Plaintiff was not allowed to participate in the dialogue related to the conditions of improvement applicable to scholarship in the second letter of appointment by her filekeeper when that was a right granted to all tenure track employee. The failure to allow Plaintiff's participation allowed the standard set by the letter to remain ambiguous on the meaning of the phrase "*and* empirical work conducted on this campus" which was emphasized as a term by the Academic Affairs Committee of the Board. In fact, Plaintiff had conducted

empirical work on campus through focus groups and by examination of secondary datasets.

c. Contrary to Plaintiff's reasonable expectations and in violation of Plaintiff's academic freedom, the Psychology Department failed to apply a peer-review standard to Plaintiff's scholarship consistent with the standard recognized by experts in her non-traditional field thereby substituting the department's inapplicable standard for research and publication based upon traditional universalism and experimentalism.

d. Contrary to Plaintiff's reasonable expectations, the Psychology Department failed to accurately represent Plaintiff's accomplishments on tenure track, including the minimization of her Robert Wood Johnson Foundation grant, the false statement regarding the date of publication of Plaintiff's journal article in *Cultural Diversity and Ethnic Minority Psychology* following second reappointment, the failure to assure that the A & P Committee was informed of the acceptance of Plaintiff's article for publication in the *Journal of Social and Clinical Psychology* in May 2013, and the failure to contextualize Plaintiff's research program including the expected pace of publication based on limited access to diverse participants, qualitative research involving hard-to-reach Latino and Asian American populations,quantitative analysis of secondary datasets, and Plaintiff's choice to submit her articles to top-tier journals in her field.

e.  Contrary to Plaintiff's reasonable expectations, the Psychology Department failed to assist Plaintiff with complications associated with her medical condition so as to make out her best case for tenure taking into consideration the pace of publication associated with Plaintiff's research program.

f.  Contrary to Plaintiff's reasonable expectations, the Psychology Department failed and refused to apply the Faculty Manual's Affirmative Action criteria to Plaintiff's case for tenure despite Plaintiff's minority status and lack of diversity at Trinity College as represented by Asian-American women and the fact that Plaintiff's scholarship occupied a non-traditional and emerging field in cultural and ethnic minority psychology.

g.  Contrary to Plaintiff's reasonable expectations, the Appointments & Promotions Appeals Board denied Plaintiff's request to allow the decision-makers at the A & P Committee, the Dean and President and the Academic Affairs Committee the opportunity to be fully informed of Plaintiff's claims of procedural defect, unfairness and discrimination following the remand of the case to the A & P Committee.

77. Defendant also breached the employment agreement for tenure by applying an arbitrary standard, not applicable to Plaintiff's research, whereby the Psychology Department judged Plaintiff's research productivity, results and program by the traditional universalism standard applicable to

experimentalism, a standard that is not employed to judge research in

Plaintiff's field.

78. As a result of Defendant's breach of contract, Plaintiff has suffered damages

including lost wages and benefits applicable to tenured employment through

the date of Plaintiff's expected retirement.

## COUNT TWO:   NEGLIGENT MISREPRESENTATION

1-75      Paragraphs one through seventy-five of Count One are incorporated by
reference and made paragraphs one through seventy-five of Count Two as though
more fully set forth herein.

76. Defendant failed to exercise due care in obtaining and communicating

information to the Plaintiff regarding the standards applicable to the tenure

decision, including, but not limited to the standard applicable to non-traditional

research and scholarship by the Psychology Department.

77. Plaintiff relied upon her continued reappointment and the communications and

advice she was given regarding her scholarship and conformed her research

and methodology to the information she received.  Defendant's Psychology

Department failed to comply with the A & P Committee's directive to provide

Plaintiff with written guidelines applicable to the department's interpretation

and application of the scholarship standard in the Faculty Manual.

79. Contrary to the representations that Plaintiff received concerning the standard

applicable to her research and Plaintiff's reasonable expectations, the

Psychology Department failed to provide advice and mentoring to Plaintiff

regarding the department's standard for scholarship, including the written

statement mandated by the A & P Committee in 2003. Plaintiff was led to believe that conducting research and creating journal articles for publication using the non-traditional research methods and programs applicable to her field of expertise would be acceptable to meet the criteria for scholarship in the department only to learn in the tenure recommendation that her non-traditional research methodology and program based on that methodology were not acceptable and/or not understood by the department when it applied a conservative, traditional model to analyze her work. Thus, the Department failed to provide critical information to Plaintiff to guide her scholarship and/or applied a shifting standard at the time of tenure contrary to what Plaintiff had been previously told.

80. Contrary to the representations that Plaintiff received concerning the standard applicable to her research and to Plaintiff's reasonable expectations, Plaintiff was not allowed to participate in the dialogue related to the conditions of improvement applicable to scholarship in the second letter of appointment by her filekeeper when that was a right granted to all tenure track employee. The failure to allow Plaintiff's participation allowed the standard set by the letter to remain ambiguous on the meaning of the phrase "*and* empirical work conducted on this campus" which was emphasized as a term by the Academic Affairs Committee. In fact, Plaintiff had conducted empirical work on campus through focus groups and by examination of secondary datasets.

81. Contrary to the representations that Plaintiff received concerning the standard applicable to her research and Plaintiff's reasonable expectations, and in violation of Plaintiff's academic freedom, the Psychology Department failed to apply a peer-review standard to Plaintiff's scholarship consistent with the standard recognized by experts in her non-traditional field thereby substituting the department's inapplicable standard for research and publication based upon traditional universalism and experimentalism.

82. Contrary to the representations that Plaintiff received concerning the standard applicable to her research and Plaintiff's reasonable expectationsthe Psychology Department failed to accurately represent Plaintiff's accomplishments on tenure track, including the minimization of her Robert Woods Johnson Foundation grant, the false statement regarding the date of publication of Plaintiff's journal article following second reappointment, the failure to assure that the A & P Committee was informed of the acceptance of Plaintiff's article for publication in May 2013, and the failure to contextualize Plaintiff's research program including the expected pace of publication based on limited access to diverse participants, qualitative research involving hard-to-reach Latino and Asian American populations, quantitative analysis of secondary datasets, and Plaintiff's choice to submit her articles to top-tier journals in her field.

83. Contrary to the representations that Plaintiff received concerning the standard applicable to her research and Plaintiff's reasonable expectations, the

34

Psychology Department failed and refused to apply the Faculty Manual's

Affirmative Action criteria to Plaintiff's case for tenure despite Plaintiff's

minority status and lack of diversity at Trinity College as represented by Asian-

American women and the fact that Plaintiff's scholarship occupied a non-

traditional and emerging field in cultural and ethnic minority psychology.

84. As a result of Defendant's conduct Plaintiff suffered anxiety, grief, physical

pain, a loss of appetite, interference with her sleep and disruption in her

professional and personal life.

85. As a result of Defendant's negligent misrepresentation, Plaintiff was denied

tenure and had suffered damages including the loss of wages and benefits,

emotional distress, physical pain, loss of enjoyment of life, the destruction of

her career in academia and harm to her reputation.

**COUNT THREE:**     **DISCRIMINATION IN VIOLATION OF TITLE VII OF THE
CIVIL RIGHTS ACT OF 1964, AS AMENDED, 42 U.S.C. § 2000e *et seq.***

1-75     Paragraphs one through seventy-five of Count One are incorporated by
reference and made paragraphs one through seventy-five of Count Three as though
more fully set forth herein.

76. Asian American women are underrepresented in university employment at the

tenured level at Trinity College and higher education in general because as a

non-White minority Asians lack the support, peer networking and knowledge of

institutional culture that can facilitate promotion and tenure decisions. During

35

Plaintiff's employment at Defendant there were no Asian American women tenured at the college and only two were on tenure track.

77. Plaintiff was treated less favorably than her non-Asian junior colleagues in that she was actively misled by her department and was not provided with the mentoring and guidance provided to non-Asian colleagues. Although her non-Asian junior colleagues were provided mentoring sessions starting in their second year and regularly thereafter, Plaintiff was ignored until her fifth year. While her non-Asian junior colleagues were provided with counseling in an effort to help them succeed, in Plaintiff's case there were no substantive discussions regarding her research methodologies and her tenured colleagues showed no interest in her research program and ongoing preparation of drafts. To the Psychology Department Plaintiff was invisible.

78. Plaintiff was treated less favorably than her non-Asian junior colleagues in the application of standards from research by the Psychology Department in a significant and material way. In Plaintiff's case, the department made conducting empirical research at Trinity College a condition of improvement applicable to her tenure case, knowing full well that Plaintiff's research methodology required secondary data analysis of large datasets while less than 3% of Hartford's population was made up of Asians, too small a group to accommodate Plaintiff's research, only making Plaintiff's task more-time consuming, and setting Plaintiff up for failure. On the other hand, a junior non-Asian colleague was advised by senior members of the department not to

36

engage in localized research because such efforts would not be worth pursuing and might interfere with research productivity.

79. The Psychology Department refused to apply the Trinity College Affirmative Action Policy to Plaintiff despite the clear applicability of the policy language to Plaintiff as a Chinese refugee who emigrated from Laos to the United States, obtained a first generation Ph.D. and is engaged in non-traditional research involving emerging methodologies applicable to ethnic minority and cultural psychology.

80. The Psychology Department's refusal to consider Plaintiff a minority for employment purposes is based upon the biased opinion of Chair Anselmi and is contrary to the expressed language of the Faculty Manual and the Trinity College Affirmative Action policy.

81. As an Asian American woman, Plaintiff was subjected to negative stereotyping by the tenured members of the Psychology Department and other decision-makers at Trinity College, represented by the explicit and implicit bias demonstrated by the treatment of Plaintiff in the tenure decision-making process from the inception of her employment.

82. Plaintiff was invisible to the department because she was an Asian American woman and expected to succeed.  Indeed, it was this perception of Asian American success in higher education at the Ph.D level that led Chair Anselmi to wrongly conclude that the Trinity College Affirmative Action policy did not apply to Plaintiff.  This failure to recognize Plaintiff as a minority is a not so

subtle form of racism that is consistent with what has been recognized as a form of stereotyping and referred to as "microaggression," an unintentional and unconscious act by a person who may be well-intentioned and believe that her action is "colorblind," but whose actions nevertheless have the effect of illegal discrimination in the terms and conditions of employment.

83. Actions denominated as "microaggressions" applicable to Asian Americans include denial of racial reality (e.g. Asian Americans are not a minority group that experiences discrimination), ascription of intelligence (e.g. Asian Americans are smart and therefore self-sufficient), second class citizenship (e.g. treated as a lesser group), and invisibility (e.g. being overlooked without conscious intent of the aggressor).

84. The tenured members of the Psychology Department and other decision-makers at Defendant discriminated against Plaintiff in the terms and condition of her employment by their actions in denying that she was a minority in the tenure employment decision when such a characterization would have been a helpful tool to review her non-traditional research.

85. The tenured members of the Psychology Department and other decision-makers at Defendant discriminated against Plaintiff in the terms and condition of her employment when they devalued and minimized her work as reflected in the conceptual and methodological criticisms of her research program.  While the Psychology Department criticized Plaintiff for not having an overarching, integrated theory, it is evident from her detailed description of her scholarship that her work was premised in an effort to understand the nature of help

seeking and psychological distress through the cultural lens of collectivism and social relationships.

86. The tenured members of the Psychology Department and other decision-makers at Defendant discriminated against Plaintiff in the terms and condition of her employment by substituting their judgment of what is considered an acceptable research methodology and program, being the traditional universalism approach based on experimentalism, rather than Plaintiff's non-traditional approach, even though Plaintiff's methodology and program are well accepted in her field.

87. The tenured members of the Psychology Department and other decision-makers at Defendant discriminated against Plaintiff in the terms and condition of her employment by delegitimizing her work product and insisting that Plaintiff's research did not achieve explainable results.  The fallacy of the Psychology Department's approach is demonstrated in their January 2013 recommendation where their analysis of Plaintiffs articles based on the Robert Wood Johnson Foundation grant research reflects a misunderstanding of the purpose of multicultural research and a lack of expertise.  Rejecting Plaintiff's non-traditional research and viewing her research through a distorted lens demonstrates bias against her as an Asian American in the way her work is devalued and she is made to be a second class citizen.

88. The tenured member of the Psychology Department and other decision-makers at Defendant discriminated against Plaintiff in the terms and condition of her employment when they failed to assist Plaintiff in obtaining clarification

of the tenure standard by allowing her to respond to the second letter of reappointment in order to shed light on the ambiguity associated with the scholarship standard's requirement that empirical work be conducted at Trinity College, and when they failed to assist Plaintiff allowing her to update the A & P Committee with the status of her publication submitted to a top journal in Plaintiff's field that was accepted for publication in May 2013.

89. The tenured members of the Psychology Department and other decision-makers at Defendant discriminated against Plaintiff in the terms and condition of her employment when they denied her tenure, despite having objectively met the standard applicable to the tenure decision, and when the Psychology Department shifted the standard applicable to Plaintiff's scholarship strictly applying the traditional model of research and rejecting Plaintiff's non-traditional approach.

90. The Appointment & Promotions Appeal Board discriminated against Plaintiff in the terms and condition of her employment when they refused to allow the A & P Committee and other decision-makers to consider the details and supporting material of Plaintiff's appeal of the decision in violation of the Affirmative Action Policy because the materials denied to the decision-makers in the appeal documents demonstrated the ways in which the Psychology Department discriminated against Plaintiff in the failure to support and mentor her and provided additional information demonstrating the validity of Plaintiff's research methods and her role as a leader in the field.

40

91. As a result of Defendant's conduct Plaintiff suffered anxiety, grief, physical pain, a loss of appetite, interference with her sleep and disruption in her professional and personal life.

92. Based on the foregoing, Defendant discriminated against Plaintiff on the basis of her race and ethnicity in the terms and conditions of her employment, including the denial of tenure and promotion, resulting in the termination of Plaintiff's employment, in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et. seq.*

93. Defendant's actions were intentional in that they were willful, wanton, and taken with reckless disregard of Plaintiff's rights.

94. As a result of Defendant's discriminatory actions, Plaintiff has suffered damages, including, but not limited to, economic and non-economic damages in the form of loss of wages and benefits, emotional distress, physical pain, loss of enjoyment of life and profession, destruction of her academic career, and harm to reputation.

95. As a further result of Defendant's discriminatory conduct, Plaintiff has incurred, and will continue to incur, attorney's fees and costs.

## COUNT FOUR:  DISCRIMINATION IN VIOLATION OF THE CONNECTICUT FAIR EMPLOYMENT PRACTICES ACT, CONN. GEN. STAT. § 46a-60 *et. seq.*

1-91    Paragraphs one through ninety-one of Count Three are incorporated by reference and made paragraphs one through ninety-one of Count Four as though more fully set forth herein.

92. Based on the foregoing, Defendant discriminated against Plaintiff on the basis of race and ethnicity in the terms and conditions of her employment, including

the denial of tenure and promotion, resulting in the termination of Plaintiff's

employment, in violation of the Connecticut Fair Employment Practices Act,

Conn. Gen. Stat. § 46a-60 *et. seq.*

93. Defendant's actions were intentional in that they were willful, wanton, and

taken with reckless disregard of Plaintiff's rights.

94. As a result of Defendant's discriminatory actions, Plaintiff has suffered

damages, including, but not limited to, economic and non-economic damages

in the form of loss of wages and benefits, emotional distress, physical pain,

loss of enjoyment of life and profession, and harm to reputation.

95. As a further result of Defendant's discriminatory conduct, Plaintiff has incurred,

and will continue to incur, attorney's fees and costs.

## DEMAND FOR RELIEF

**WHEREFORE**, the plaintiff demands a TRIAL BY JURY and judgment against

the Defendant as follows:

1.  An order reinstating the plaintiff to a position as Associate Professor of

Psychology with tenure and awarding her the salary and benefits she would

have received had she been granted promotion and tenure in 2013 together

with interest;

2.  Equitable relief, including but not limited to, the publication of psychology

departmental guidelines for tenure, institutional sanctions against the

department for discriminatory acts (such as an externally appointed

department chair, audit of the department, and budgetary sanctions),

institutional training for all faculty and administrators regarding multicultural sensitivity, implicit and explicit biases, and diversity issues, and a mandate for the institution to obtain a membership to the National Center for Faculty Development and Diversity to ensure access to critical resources for minority and underrepresented faculty.

3. Economic damages including lost wages and benefits

4. Non-economic damages, but not limited to, damages for emotional distress, pain, humiliation and embarrassment, loss of enjoyment of life, loss of enjoyment of profession, and harm to reputation.

5. Punitive damages pursuant to 42 U.S.C. § 1981a and Connecticut General Statutes § 46a-104 as "legal relief";

6. Interest;

7. Attorney's fees and litigation costs, 42 U.S.C. § 2000e-5 and 42 U.S.C. § 1988, and Connecticut General Statutes § 46a-104

8. Such other further monetary or injunctive relief as this Court deems necessary and proper.

Dated at New London, Connecticut this 22nd day of September, 2014

PLAINTIFF
JANET CHANG

By:_____
Jacques J. Parenteau (ct09771)
Madsen-Prestley & Parenteau, LLC
105 Huntington Street
New London, CT 06320
Tel: (860) 442-2466
Fax: (860) 447-9206
Email: jparenteau@mppjustice.com